UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KASEY L. SANDLIN,                              )
                                               )
                    Plaintiff,                 )
                                               )
          v.                                   )          No. 1:20-cv-02333-SEB-DLP
                                               )
BELL SPORTS, INC.,                             )
                                               )
                    Defendant.                 )

**ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY**

This product liability case is now before the Court on Defendant's Motions to

Exclude or Limit the Opinion Testimony of Polly Westcott, Psy.D., HSPP [Dkt. 97] and

Thomas Eagar, SC.D., P.E. and Alan Cote [Dkt. 107] and Plaintiff's Motions to Exclude

Expert Witnesses Stephen Werner, PhD., P.E. [Dkt. 104], Elizabeth H. Raphael, M.D.

[Dkt. 105], and Ronald Parrington [Dkt. 106].  Each has been identified as an expert

witness and scheduled to testify in the upcoming trial set for December 5, 2022.  The

pending motions challenge their respective qualifications, methodology, and/or the scope

and relevance of their testimony.  We address each of these motions in turn below.

**Applicable Legal Standard**

The admissibility of expert testimony is governed by the framework set out in

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579

(1993).  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  Applying

this framework, courts must undertake:

a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education"; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (quoting Fed. R.

Evid. 702) (internal citations omitted); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 141 (1999) (extending the *Daubert* admissibility framework to expert

testimony in the social sciences). "The *Daubert* standard applies to all expert testimony,

whether it relates to an area of traditional scientific competence or whether it is founded

on engineering principles or other technical or specialized expertise." *Smith v. Ford*

*Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho*, 536 U.S. at 141). The

burden is on the proponent of the expert to demonstrate that the expert's testimony would

satisfy the *Daubert* standard. *Lewis*, 561 F.3d 705.

## Discussion

### I.    Defendant's Motions to Exclude

#### A.  Polly Westcott

Plaintiff has designated Polly Westcott, Psy.D., HSPP, a clinical

neuropsychologist at Indiana Health Group, as an expert witness to:

address the initial injuries and treatment of [Plaintiff] as a direct result of the August 8, 2018 incident, the changes in physical, cognitive, and emotional functioning which continue to impact her daily functioning, the results of various testing conducted on [Plaintiff] during the neuropsychological examination, and Dr. Westcott's diagnoses and prognosis of [Plaintiff]'s ongoing neurologic and psychiatric impairments from the incident.

Dkt. 98-1.  Dr. Westcott obtained a Bachelor of Arts in Psychology from Purdue University in 1997, a Master of Science in Counseling Psychology from Indiana University in 1999, a Master of Arts in Clinical Psychology from Widener University in 2002, and a Doctor of Psychology from Widener University in 2004.  Westcott Aff. ¶ 1. Dr. Westcott's curriculum vitae, included as part of her report, indicates that she performs neuropsychological and forensic assessments, psychological assessments, biofeedback, psychotherapy, and counseling.  Dkt. 98-2.

As part of her work in this case, Dr. Westcott interviewed Plaintiff and Plaintiff's boyfriend, reviewed Plaintiff's medical records, and conducted several evaluative assessments of Plaintiff in order to gather data to assist her in opining regarding Plaintiff's estimated premorbid abilities, general cognitive activity, attention and processing speed, memory, language, visuospatial, and visuoconstructional abilities, executive functions, motor skills, and emotional state.[1]  Based on the results of this testing, Dr. Westcott concludes in her report that Plaintiff suffers from mild neurocognitive disorder secondary to traumatic brain injury, chronic major depressive disorder, chronic generalized anxiety disorder, and chronic posttraumatic stress disorder.

Dr. Westcott's expert report contains her conclusions regarding Plaintiff's condition based on her interpretations of the results of the tests she performed on Plaintiff

---

[1] These evaluative assessments included the following: Wechsler Adult Intelligence Scale—IV; Wide Range Achievement Test—4 Reading, Spelling & Math subtests; Wechsler Memory Scale—IV (Stories and Visual Reproduction); Rey Auditory Verbal Learning Test; Digit Vigilance Test; Boston Naming Tests; Trail Making Tests; Stroop Test; Brooklet Category Test; COWAT & Animal Fluency; Rey Complex Figure; Grooved Pegboard; Grip Strength; MCMI-4; BDI-2; BAI; PCL-5; MSVP; and TOMM.

but does not include any of the raw data on which her evaluations are based. As one example, Dr. Westcott opines in her report that "[t]he speed at which [Plaintiff] can process information is low average[,]" but the report does not disclose Plaintiff's actual tests scores or the scale of scores against which Dr. Westcott measured Plaintiff's test results to reach her conclusions. This is the case for each of Dr. Wescott's opinions regarding Plaintiff's current cognitive and emotional condition.

Defendant moves to exclude Dr. Westcott from testifying at trial on grounds that: (1) Dr. Westcott's failure to produce the raw data underlying her conclusions violates Federal Rule of Civil Procedure 26; and (2) Dr. Westcott is not qualified to render an opinion on medical causation because she is not a medical doctor, and her causation opinion is based on unreliable methods. Plaintiff opposes Defendant's motion. We address each of these grounds for exclusion in turn below.

### 1. Failure to Disclose Raw Data

Defendant first argues that Dr. Westcott's testimony must be excluded because she failed to provide the underlying raw data and test scores on which she based her conclusions, in violation of Rule 26 of the Federal Rules of Civil Procedure. Defendant claims this failure prevented it from being able to adequately cross-examine Dr. Westcott at her deposition. Plaintiff rejoins that Dr. Westcott's testimony should not be excluded on this basis because the American Psychological Association (APA)'s Ethical Principles and Code of Conduct prohibit Dr. Westcott from disclosing such information to a non-psychologist. Plaintiff further argues that, in accordance with Defendant's request, prior to her deposition, Dr. Westcott disclosed the raw data and test scores to Defendant's

neuropsychologist expert, Dr. Fred Unverzagt, and thus, defense counsel could have accessed the data through Dr. Unvertzagt to prepare for Dr. Westcott's deposition.

Seventh Circuit law is clear that "'experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data.'" *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) (quoting *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000)); *accord United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("[E]xperts' opinions are worthless without data and reasons.") (quotation marks and citation omitted). It is therefore "critical under [Federal Rule of Evidence] 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Malagon*, 964 F.3d 657, 660 (7th Cir. 2020) (quotation marks and citation omitted). In line with these principles, Rule 26 requires that an expert's written report contain "the data or other information considered by the witness in forming [their opinions]." Fed. R. Civ. P. 26(a)(2)(B). Thus, in federal court, "an expert witness must produce all data she has considered in reaching her opinions ...." *Ford v. Saul*, 950 F.3d 1141, 1158 (9th Cir. 2020) (citations omitted).

Here, in advance of Dr. Westcott's deposition, defense counsel requested that Plaintiff's counsel produce the raw data, including test scores, underlying Dr. Wescott's conclusions to enable Defendant to cross-examine Dr. Westcott regarding the basis for her opinions on Plaintiff's condition. Plaintiff's counsel responded that Dr. Westcott would produce the raw data and test scores only to another Ph.D. neuropsychologist because producing it to anyone else would constitute a violation of the APA's Ethical

Principles.[2]  Thereafter, defense counsel requested that Dr. Westcott provide the raw data to Defendant's consulting neuropsychologist.  In accordance with this request, prior to her deposition, Dr. Westcott provided her entire file and raw testing data directly to Defendant's neuropsychologist, Dr. Unverzagt.

In preparing for Dr. Westcott's deposition, Defendant renewed its request for Plaintiff to produce Dr. Westcott's underlying raw data to defense counsel.  Plaintiff responded that Dr. Westcott would not provide the raw data to defense counsel because it was an ethical violation, but that Defendant's expert, Dr. Unverzagt, should provide the information to defense counsel to prepare for cross-examination.  Defendant offered to give the data a specific confidentiality designation to allow it to be disclosed and to allow counsel to cross examine Dr. Westcott regarding Plaintiff's scores and the other raw data. Plaintiff and Dr. Westcott again refused to produce the information directly to defense counsel.

On November 9, 2021, Defendant proceeded with Dr. Westcott's deposition without enlisting the court to address her refusal to provide to defense counsel her underlying raw data and Plaintiff's test scores.  During the deposition, defense counsel

---

[2] The APA position statement which Plaintiff references provides in relevant part as follows:

> In the course of the practice of psychological and neuropsychological assessment, neuropsychologists may receive requests from attorneys for copies of test protocols, and/or requests to audio or videotape testing sessions.  Copying test protocols, video and/or audiotaping a psychological or neuropsychological evaluation for release to a non-psychologist violates the Ethical Principles of Psychologists and Code of Conduct (APA 1992), by placing confidential test procedures in the public domain (APA Principle 2.10), and by making tests available to persons unqualified to interpret them (APA Principles 2.02, 2.06).

asked a final time for the underlying raw data and test scores and Dr. Westcott again denied the request. Defendant claims that, due to her refusal, defense counsel was precluded from questioning Dr. Westcott regarding the foundation and basis of her expert opinions regarding Plaintiff's traumatic brain injury, and on this basis seeks to have her testimony excluded.

With regard to Dr. Westcott's ethical constraints, Plaintiff cites a position statement from the National Academy of Neuropsychology addressing situations in which neuropsychologists receive requests from attorneys for copies of test protocols and/or requests to audio or videotape testing sessions. The position statement referenced by Plaintiff advises as follows: "Copying test protocols, video and/or audiotaping a psychological or neuropsychological evaluation for release to a non-psychologist violates the Ethical Principles of Psychologists and Code of Conduct (APA 1992), by placing confidential test procedures in the public domain (APA Principle 2.10), and by making tests available to persons unqualified to interpret them (APA Principles 2.02, 2.06)." Westcott Aff. ¶ 6 (citing Official Position Statements of the National Academy of Neuropsychology on Test Security).

Initially, we note that it is our understanding that Defendant is seeking the underlying raw data and test scores on which Dr. Westcott relied in forming her opinions, not copies of testing protocols or materials. In any event, to the extent that Dr. Westcott claims that she is prevented by the APA's ethical code from disclosing raw test data to anyone other than a "qualified" psychologist, courts have recognized that the current APA ethical standards "no longer discuss[] whether individuals are 'qualified' to use raw

data." *Glennon v. Performance Food Group, Inc.*, No. 2:20-cv-38, 2021 WL 3130050, at *5 (S.D. Ga. July 23, 2021) (comparing APA Ethical Standard 2.02, which was replaced in 2002, with APA Ethical Standard 9.04). Rather, "the APA has shifted its focus from prohibiting non-psychologists' access to raw data to allowing some disclosure of such data if the patient consents." *Id.*

Specifically, Ethical Standard 9.04 states, "Pursuant to a client/patient release, psychologists provide test data to the client/patient or other persons identified in the release. Psychologists may refrain from releasing test data to protect a client/patient or others from substantial harm or misuse or misrepresentation of the data or the test, recognizing that in many instances release of confidential information under these circumstances is regulated by law." Ethical Principles of Psychologists & Code of Conduct § 9.04 (Am. Psych. Ass'n 2017). This rule further provides that "[i]n the absence of a client/patient release, psychologists provide test data only as required by law *or court order*," (*id.* (emphasis added)), thereby specifically contemplating the need to produce information when required to do so by a court. Accordingly, Plaintiff has not pointed us to any "current ethical guidelines that would preclude the production of test data to non-psychologists, especially within the context of a legal dispute." *Glennon*, 2021 WL 3130050, at *5.

Nevertheless, given the ethical concerns related to the disclosure of psychological test data and materials, "courts have taken a variety of approaches" in balancing such concerns with the Rule 26 disclosure requirements, including "ordering full disclosure without qualification, requiring disclosure only to opposing counsel's qualified expert

witness, or issuing a protective order." *Id.* at *6 (citing *Taylor v. Erna*, No. CIVA 08-10534, 2009 WL 2425839, at *2 (D. Mass. Aug. 3, 2009) (collecting cases)).  Here, while Plaintiff has already disclosed the information to Defendant's expert, there is no indication that a protective order would not resolve Dr. Westcott's concerns with regard to disclosing the underlying raw data and test scores directly to Defendant's attorneys to enable them to fully prepare Defendant's defense.

Accordingly, it is <u>ORDERED</u> that Plaintiff disclose to defense counsel the underlying raw data and test scores relied upon by Dr. Westcott in reaching her opinions in this matter, pursuant to a stipulated protective order submitted to and approved by the Court within thirty (30) days of the date of this Order.  We will not, however, exclude Dr. Westcott's opinions based on her failure to previously disclose this information directly to defense counsel.  As discussed above, Dr. Westcott disclosed the underlying raw data and test scores to Defendant's expert, consistent with what she believed were her ethical obligations.  It is not clear to us why Defendant did not raise this issue earlier with the court, either by filing a motion to compel or a motion for protective order prior to Dr. Westcott's deposition, if it believed, as it obviously does, that such disclosure was insufficient under Rule 26.  Under these circumstances, exclusion of Dr. Westcott's testimony is not the appropriate remedy.

## 2.    Admissibility of Testimony as to Causation

Defendant next argues that Dr. Westcott is not qualified to opine on whether Plaintiff's symptoms were caused by the bicycle accident or the continuation of preexisting issues because Dr. Westcott is not a medical doctor and is not board certified

in neurology or any related field.  Defendant further argues that Dr. Westcott's causation testimony should be excluded as unreliable because her opinion is based solely on self-reports from Plaintiff regarding her condition that are inconsistent with the objective medical evidence.  Plaintiff rejoins that, given Dr. Westcott's extensive training and experience in the field of neuropsychology, she is qualified to testify as to causation, and further, that her testimony meets the reliability standard under *Daubert* and Rule 702.

We turn first to address Dr. Westcott's qualifications to testify as to causation. "Most courts faced with this question conclude if a proper foundation is laid, a neuropsychologist may provide causation testimony." *Rimes v. MVT Servs., LLC*, No. 19-cv-00282-JFH-JPJ, 2020 WL 8617211, at *3 (N.D. Okla. Aug. 25, 2020) (collecting cases); *see also Bennett v. Richmond*, 960 N.E.2d 782, 786 (Ind. 2012) (holding that neither Rule 702 nor *Daubert* "supports a per se rule banning psychologists' [causation] testimony" and finding the trial court did not abuse its discretion in determining psychologist was qualified to opine regarding cause of brain injury).  Here, based on Dr. Westcott's expert report and curriculum vitae, which detail her more than fifteen years of training and experience in the field of neuropsychology with a particular focus in traumatic brain injuries, we are not persuaded that Dr. Westcott cannot establish the proper foundation at trial to testify as to cause of Plaintiff's brain injury and cognitive impairments.  Accordingly, we will not at this time exclude Dr. Westcott's causation testimony based on a finding that she is unqualified to offer such an opinion.  However, if Plaintiff intends to have Dr. Westcott testify regarding causation at trial, she must first establish the appropriate evidentiary foundation for such testimony.

We turn next to Defendant's contention that Dr. Westcott's causation opinion must be excluded because it is based on unreliable methodology.  Dr. Westcott's neurological evaluation of Plaintiff consisted of: (1) a clinical interview; (2) a comprehensive review of Plaintiff's medical records; and (3) a total of approximately twenty motor, psychological, and cognitive tests.  In addition to Plaintiff, Dr. Westcott conducted a separate collateral interview of Plaintiff's longtime boyfriend of 30 years.  Dr. Westcott's report indicates that she also gave Plaintiff a sight word reading test and reviewed Plaintiff's academic and employment histories to assess her premorbid abilities in reaching her conclusion as to the cause of Plaintiff's brain injury and post-injury cognitive and emotional impairments.

Dr. Westcott's causation opinion thus reflects the results of her comprehensive forensic neuropsychological evaluation of Plaintiff, which included a series of standardized and well-recognized psychological and cognitive assessments, personal interviews with Plaintiff and her boyfriend of 30 years, and her review of Plaintiff's medical records and premorbid abilities.  We find that this methodology is sufficient to satisfy the *Daubert* reliability standard, particularly considering that it is similar to the methodology employed by other qualified experts in reaching their conclusions regarding the cause of brain injuries.  *See, e.g.*, *Bennett*, 960 N.E.2d at 784, 792 (psychologist reviewed the plaintiff's medical records, interviewed plaintiff and his wife, and "administered a battery of neuropsychological tests" to the plaintiff in reaching conclusion regarding cause of brain injury); *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 691 (Colo. 1998) (en banc) (neuropsychologist administered tests that were

"part of a standardized battery described as the most respected and widely documented in the neuropsychology profession" and had "prepared a far-reaching background and case history to use as a backdrop for his analysis of the test results" to reach his conclusion as to the cause of the plaintiff's brain injury); *Cunningham v. Montgomery*, 921 P.2d 1355, 1357 (Or. Ct. App. 1996) (en banc) (neuropsychologist performed "a battery of cognitive tests including intelligence tests, memory tests, tests for concentration and attention, [and] tests for verbal skills and for visual perceptual abilities" to reach her conclusion as to causation of brain injury).

Defendant's contention that Dr. Westcott's causation opinion is unreliable because she relied "solely on Plaintiff's statements," (Dkt. 98 at 14), is without merit as it is clear from Dr. Westcott's report that those statements were not the only basis for her causation opinion. Dr. Westcott permissibly considered Plaintiff's self-reports but they were only one part of her broader analysis, as described above. To the extent Defendant contends that Dr. Westcott relied too heavily on Plaintiff's self-reports or that those self-assessments "contradict medical records," (*id.* at 15), those are topics to be explored on cross-examination, since they go to the weight and credibility of Dr. Westcott's testimony, not the reliability of her methodology.

For these reasons, assuming Plaintiff succeeds in laying the foundation for this testimony at trial, Dr. Westcott will be permitted to testify as to causation.

### B. Thomas Eagar and Alan Cote

Plaintiff has designated Alan Cote as an expert witness to testify at trial regarding the allegedly defective design of the Bell Kicks 650 pedal and Thomas Eagar, Ph.D. as an

expert to testify regarding the metallurgical composition of the fractured pedal adapter and the cause of its catastrophic failure.  Defendant has moved to exclude or limit both of these experts' testimony.  We address the parties' arguments as to each expert in turn below.

### 1.  Alan Cote

Alan Cote is a mechanical engineer holding a Bachelor of Science degree in mechanical engineering from the University of Buffalo.  Mr. Cotes has more than 30 years of experience in the bicycle industry as a product tester, engineer, journalist, and cycling competitor.  His relevant experience includes, *inter alia*, bicycle assembly/maintenance procedures, product design, mechanical failure, and industry standards of practice.  Mr. Cote is listed as an inventor on four United States patents related to bicycles, three of which are specifically focused on measuring force and power applied by a cyclist to bicycle pedals, and he is admitted to practice before the United States Patent and Trademark Office.  He has published critical reviews of bicycles and accessories, including assembly and testing of more than two hundred bicycles.  He has also ridden more than 150,000 miles as a cyclist with over ten years of competitive experience as an elite-level racer.

In this case, Mr. Cote is expected to testify that the Bell Kicks 650 pedal at issue in this litigation was improperly designed with right-hand (instead of left-hand) threads on the portion of the right pedal adapter mating with the right pedal spindle, which created a self-loosening threaded joint between the adaptor and the pedal axle.  Cote Rep. at 3.  According to Mr. Cote, the right-hand threads in the Bell Kicks 650 are the "reverse

orientation of a conventional pedal-crank joint." *Id.* at 8.  Mr. Cote opines in his report that this self-loosening threaded joint caused the adapter to partially unscrew under the precession forces associated with routine pedaling of the bicycle.  *Id.*  He is expected to testify that "play" in the loose joint then enabled deformation of the threads on the joint, causing the joint to bind and cease unscrewing so that it instead remained in a partially unscrewed position.  *Id.*  With the adaptor partially unscrewed, Mr. Cote has opined, it no longer carried pedaling forces as it was designed, which allowed a fatigue crack to open in the threaded portion of the loosened joint that, over time, ultimately propagated through more than half of the cross section of the pedal adaptor under Plaintiff's routine pedaling forces.[3]  *Id.*

In developing his report, Mr. Cote first conducted visual inspections of the subject Bell Kicks 650 pedal and pedal adapter, other Bell Kicks 650 exemplar pedals, and a Shimano-brand pedal for comparison.  After "staring at the [Bell Sports] pedal for a while," he realized through his focusing on the thread direction on the pedal adapter and applying his knowledge that precession forces on a bicycle "have a tendency to self-tighten a conventional pedal joint," that "the other portion of the joint between the pedal adapter and the pedal axle in the Bell Sports system was a self-loosening joint," because

---

[3] Mr. Cote also opines in his report that the pedal adapter ultimately failed as Plaintiff was pedaling uphill, causing her to crash, and that Defendant failed to warn of the danger of improperly installed pedals or provide proper instructions as to the installation of subject pedal. Although Defendant seeks to have Mr. Cote's "testimony in its entirety" excluded, it has put forth no substantive argument as to grounds for excluding these opinions.  Accordingly, we do not address them further in this Order.

14

it was designed with right-hand threads on the right pedal adapter, the opposite orientation of a conventional pedal joint. Cote Dep. at 69.

To test his theory that the Bell Kicks 650 pedal would self-loosen under the motion of pedaling, Mr. Cote screwed an exemplar Bell Kicks 650 pedal adapter into an exemplar Bell Kicks 650 pedal and connected the pedal to a bicycle crankarm. Once the pedal was attached, he manually mimicked the pedaling motion utilizing his hand to turn it in order to understand how the pedaling motion and precession force affected the threaded joint connection between the right pedal spindle and the right pedal adapter. Mr. Cote observed that, "simply by … rotating the crank arm … held in [his] hand and holding the pedal as it would be with a cyclist's foot in it, it was clear that the joint was self-loosening …." Cote Dep. at 69–70. Mr. Cote testified, however, that the Bell Kicks 650 pedal never self-loosened during any of his testing when the threaded portion of the crank arm and the threaded portion of the adapter were both fully tightened. *Id.* at 70.

Mr. Cote also tested a Shimano-brand pedal in this same fashion. The Shimano pedal has a threaded joint similar to the threaded joint between the pedal spindle and the adapter of the Bell Kicks 650 pedal, except that the Shimano pedal uses left-handed "S" threads in the pedal axle as opposed to the right-handed threads used in the Bell Kicks 650 pedal adapter.[4] Mr. Cote testified that when he performed the test on the Shimano

---

[4] We note, however, that the Shimano pedal, unlike the Bell Kicks 650 system, does not attach a pedal adapter to the pedal by screwing the adapter into a rotating spindle on the pedal. Rather, the Shimano pedal is directly attached to the crank arm.

pedal, the pedal tightened under the simulated pedaling forces. This is in contrast to the Bell Kicks 650 pedal, which had loosened under those same forces. Cote Dep. at 74.

Defendant does not challenge Mr. Cote's qualifications to testify at trial but argues that his "precession theory," to wit, that the Bell Kicks 650 pedal adapter "self-loosened" as a result of precession forces, must be excluded as unreliable and unhelpful to the jury. For the following reasons, we have come to the same conclusion.

To the extent Mr. Cote intended to testify simply as to the general nature of precession forces and the effect such forces have on bicycle pedal joints that are already loosened, Plaintiff has shown that the testing he performed would likely meet the standard of reliability for demonstrating those basic principles, which Defendant has conceded are widely known and accepted concepts in the engineering field. However, Defendant's criticism of Mr. Cote's methodology is not that his handheld testing method was an improper means to demonstrate the manner in which precession forces work in general but that it was an unreliable method to prove the specific conclusion he plans to offer in this case, to wit, that the thread design in the Bell Kicks 650 pedal adaptor would cause the adapter to self-loosen from the rotating spindle of a pedal to which it was tightly affixed, solely under precession forces associated with routine pedaling.

Defendant's criticism is well-taken. Even assuming that the testing Mr. Cote performed in this case is a reliable method for demonstrating and understanding the basic principles of precession, there is no indication that the conclusion Mr. Cote has reached in extrapolating from those basic and well-recognized principles is supported by any reliable methodology. For example, Mr. Cote did not rely on any objective data in this

16

case to measure to precession forces before opining that such forces could loosen an adapter that, like the subject adapter, had been tightened into the threads of a pedal spindle that rotate along with the threads of the adapter.

While such data might not be necessary in every case, such as when the expert's conclusion is already widely understood within the scientific community to derive directly from the underlying basic principles of the discipline, no such showing has been made here.  Nor has Mr. Cote's theory been submitted to peer review, published, or have a known or accepted rate of error.  *See Bielskis v. Louisville Ladder Inc.*, 663 F.3d 887, 895 (7th Cir. 2011) (finding that an expert's "'methodology' of looking at the failed caster stem with his naked eye could not be subjected to peer review[,]" and that it was not "possible to assess the known or potential rate of error behind [the expert's] methodology because he used no particular methodology to reach his conclusions").

The need for underlying data is particularly critical in this case because Mr. Cote concedes that he was *unable* to prove his theory that the exemplar pedal adaptor would self-loosen under precession forces when the pedal and pedal adapter were tightly installed in any of the tests he performed.  Rather, Mr. Cote testified in his deposition that the adapter never actually self-loosened in any of his tests when it was installed tightly, as the parties agree the subject pedal and adapter originally were installed.  Cote Dep. at 70–71.  Under these circumstances, we conclude that the "analytical gap" between the data and the opinion Mr. Cote has proffered is simply "too wide" to be reliable.  *See Turpin v. Merrell Dow Pharmas., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992), *cert. denied*, 506 U.S.

17

826 (1992) ("The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue … is too wide.").

For these reasons, Defendant's motion to exclude Mr. Cote's opinions and testimony regarding his "precession theory," is granted.

### 2.  Thomas Eagar, Ph.D.

Thomas Eagar, Ph.D., is a metallurgist and current Professor of Materials Engineering and Engineering Management at Massachusetts Institute of Technology ("MIT"), where he has been a member of the faculty since 1976.  Dr. Eagar received a bachelor's degree in Metallurgy in 1972 and a Doctor of Science degree in Metallurgy in 1975 from MIT.  After graduation, Dr. Eagar worked on alloy development and steel manufacturing in the Research and Development of Bethlehem Steel Corporation.  While at MIT, Dr. Eagar has published and taught graduate and undergraduate students about the manufacture of metal parts, metal fabrications, thermodynamics, fracture mechanics, steel technology, failure analysis, and structural materials design.  In his work outside of MIT, Dr. Eagar has consulted on materials selection, manufacturing, quality control, total quality management, and non-destructive testing.  He also has extensive engineering consulting experience, including in the areas of design consultation, failure analysis, and rehabilitation of structures.

Dr. Eagar is a registered professional engineer and a member of the National Academy of Engineers, the American Society of Engineers, the American Society of Testing and Materials, and the American Institute of Mining, Metallurgical and Petroleum Engineers, among other organizations.  He has authored 233 publications and

17 patents and has provided testimony before the United States Congress and the United States Department of Energy on issues related to metallurgy and fields of material science. Dr. Eagar has also conducted analyses on more than one hundred metallurgical and forensic engineering projects and has testified as an expert in state and federal courts and international arbitrations for over thirty years.

Plaintiff retained Dr. Eagar to examine the failed right pedal adapter at issue in this case and opine as to the cause of the catastrophic failure. Prior to rendering his opinion in this matter, Dr. Eagar reviewed photographs of the fracture surface of the right pedal adapter, inspected the fracture surface of the subject right pedal adapter in a Digital Scanning Microscope, performed metallography and hardness tests on an exemplar pedal adapter, and reviewed documents produced by Defendant in discovery related to the pedal adapter.

Based on his review of these materials and the metallurgical and hardness testing he performed on an exemplar pedal, Dr. Eagar opined that the steel used in the pedal adapter was heat treated to a temperature higher than the "desired maximum hardness for most bolding applications." Eagar Rep. at 4. He further opined on the alleged defective design of the adapter spindle, arguing that the carbon content in the adapter spindle made it "case hardened" such that the surface of the adapter spindle had "exceeding strength but deficient toughness" and was approaching the "brittleness of glass." *Id.* at 6. Dr. Edgar also opined that the "notch" produced by the threads increased the stress concentrations in the adapter. *Id.* at 4. In his report, Dr. Eagar summarized his design defect findings and opinions as follows:

> Metallurgical testing of the fracture surface indicates that it was a fatigue crack that grew due to a severe stress concentration. This stress concentration is inherent with a threaded connection but the fatigue crack resistant was seriously degraded by case hardening of the adapter spindle. This greatly increased the surface strength but damaged the fatigue resistance. There was no engineering analysis presented showing that the designers estimated the stresses to which the adapter was subjected in service. This adapter spindle was deficiently designed and was not fit for its intended purpose to attach a bicycle pedal to a crank arm. There is no evidence that the spindle was abused in service.

Eagar Rep. at 6-7.

Defendant seeks to have Dr. Eagar's testimony excluded in its entirety on grounds that he is not qualified to testify about Plaintiff's alleged manufacturing defect, design defect, or failure to warn claims. Even if qualified, Defendant argues that Dr. Eagar's testimony must be excluded as unreliable. Defendant also seeks to exclude under Federal Rule of Civil Procedure 37 a three-paragraph document prepared by Dr. Eagar in support of a previously undisclosed design defect opinion. The document is titled "Additional References" and was not provided to Defendant until October 15, 2021, more than one month after the expert report deadline and on the Friday before the Monday of his deposition.

### a. Failure to Warn, Manufacturing Defect, and Belated Disclosure

We can dispense quickly with several of the issues raised by Defendant in its motion to exclude. First, in her response, Plaintiff has indicated that she does not intend to call Dr. Eagar to testify regarding his failure to warn opinions. Accordingly, she has acceded to Defendant's motion to exclude as to this issue.

Second, although there is a heading in Plaintiff's response brief titled, "Dr. Eagar's 'Belatedly Disclosed Defect Opinion,'" she offers no substantive argument as to why Dr. Eagar's belatedly disclosed opinions should not be excluded under Rule 37. Defendant's motion will therefore be granted as to its request to exclude the untimely-disclosed document authored by Dr. Eagar titled "Additional References," as well as any testimony related to the document.

Third, while Plaintiff has addressed the admissibility of Dr. Eagar's testimony as a whole, she has not specifically addressed Defendants' arguments regarding Dr. Eagar's intention to offer opinions regarding any potential manufacturing defect in the Bell Kicks 650 pedal system. We understand Dr. Eagar's expert report to address design, not manufacturing defects; to our knowledge the issue of manufacturing defects was raised only tangentially during Dr. Eagar's deposition. Because Plaintiff has not responded to this argument and Dr. Eagar's report does not appear to disclose any manufacturing defect opinions, Defendants' motion as to Dr. Eagar's manufacturing defect opinions is granted to the extent that he is precluded from offering any opinions not disclosed in his report.[5]

### b. Qualifications

With respect to Dr. Eagar's remaining testimony, Defendant argues that he is not qualified to offer his design defect opinions in this case because he has "never testified in

---

[5] Defendant argues that, if Dr. Eagar's manufacturing defect testimony is excluded, it is entitled to summary judgment on Plaintiff's manufacturing defect claim as she has designated no other expert to testify on this issue. Without Plaintiff's response on this issue, we will not at this time grant such relief when there is not currently a summary judgment motion before us.

other litigated matters where he opined on fatigue failure in a component like a bicycle pedal or spindle adapter," has "never done any design consultation or failure analysis work for the manufacturer of a bicycle pedal or spindle adapter," and has "never published any peer-reviewed literature on case hardening in a component like a bicycle crank arm or bicycle pedal." Dkt. 108 at 11, 17. Rather, Defendant argues, Dr. Eagar's prior bicycle-related experience and testimony have been limited to analysis of other bicycle components, including a wheel spoke, the seat, and the handlebars. *Id.* at 17.

However, the *Daubert* and Rule 702 requirements do not require us to define the scope of Dr. Eagar's experience and qualifications as narrowly as Defendant would like. The nature of Dr. Eagar's testimony here involves the metallurgical testing and analysis of a metal component, which are topics about which he is imminently qualified to testify as a professor of materials and engineering systems at MIT who has a doctorate of sciences in metallurgy from MIT and over 40 years of experience in materials engineering teaching and research, including in the areas of fracture mechanics, failure analysis, and steel technology.

As Plaintiff argues, the fact that the metal at issue here is in the form of a bicycle pedal as opposed to some other product does not render Dr. Eagar unqualified to testify with regard to the metallography and hardness tests he performed and his analysis based on those tests regarding potential failure scenarios, all of which are areas "squarely within his field of study and expertise." *Great Northern Ins. Co. v. Power Cooling, Inc.*, No. 06-CV-874, 2007 WL 4688411, at *7 (E.D.N.Y. Dec. 18, 2007) (finding Dr. Eagar qualified to render reliable metallurgy opinions regarding the metal parts of a failed turbine despite

the defendant's claim that he had "no expertise in steam turbine design").  Because the task for which he has been retained in this lawsuit is within Dr. Eagar's experience and qualifications, the fact that he does not have prior experience testifying about the particular product at issue here is not disqualifying.  *See Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 799 (E.D. Wis. 2010) ("[N]othing in Rule 702 or the jurisprudence interpreting the rule indicates that an expert must have specific knowledge about the precise object of the litigation.") (collecting cases).  Any deficiencies in Dr. Eagar's qualifications that Defendant believes are relevant can be the subject of cross-examination if Dr. Eagar's testimony is otherwise admissible.

### c.  Reliability and Helpfulness

Defendant next argues that Dr. Eagar's design defect testimony must be excluded as unreliable because it "failed to establish that the bike pedal was defective in design." Dkt. 108 at 17.  However, while Defendant may disagree with Dr. Eagar's conclusions, it is not within the court's purview in ruling on this motion to determine whether Dr. Eagar's opinions are correct or in fact prove defective design in this case.  Rather, the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact …."  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Here, Dr. Eagar's design defect opinions regarding the case hardening of the pedal adapter, his "notch" opinion, and the role these alleged defects played in the catastrophic pedal adapter are based upon his review of the data, metallurgical and hardness testing of the pedal adapter, and application of his extensive metallurgical knowledge and

experience, which processes and methods Plaintiff has fully detailed in her response. Using reliable techniques, Dr. Eagar inspected the subject pedal, including examining it in the Digital Scanning Microscope, and tested an exemplar pedal adapter spindle using sophisticated scientific equipment to reach his conclusions, all of which we understand to be standard and recognized tests and methods in his field of expertise.

Defendant cites testimony from its expert, Ronald Parrington, to argue that the manner in which Dr. Eagar performed some of his testing resulted in inaccurate data, but the fact that Defendant disagrees with the conclusions reached by Dr. Eagar is not a basis for excluding his testimony. Rather, "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence … rather than wholesale exclusion." *Daubert*, 509 U.S. at 596 (citations omitted).

Defendant also takes issue with Dr. Eagar's failure to consider and eliminate certain alternative causes in rendering his opinion, but, as the Eastern District of New York judge recognized in addressing a similar objection to Dr. Eagar's testimony, Defendant "seems to confuse Dr. Eagar's process of rejecting alternative theories because, in his view, there are no possible explanations other than the one proffered, with the process of commencing an analysis with a set of genuine alternatives, each one which is assumed to be a potential candidate that could feasibly have caused the observed damage." *Great Northern Ins.*, 2007 WL 4688411, at *10. In the same vein, we hold that Defendant's differential diagnosis argument does not provide a sufficient basis on which to exclude Dr. Eagar's proffered testimony at trial.

For these reasons, we find that Plaintiff has shown that Dr. Eagar's proffered opinions and testimony regarding design defect are based on sufficient facts and data and are the product of reliable scientific principles and methods.  Moreover, because Defendant has not shown that Dr. Eagar's conclusions are wholly speculative or conjectural, admission of his testimony will not result in "unfair prejudice" to Defendant, we therefore reject its argument that his testimony should be excluded as unhelpful to the trier of fact on those grounds.  To the extent Defendant believes Dr. Eagar's opinions are still based on unfounded assumptions and/or incomplete evidence, those issues can be explored on cross examination as they go to the weight, not admissibility of his opinions.

## II.    Plaintiff's Motions to Exclude

### A.  Elizabeth H. Raphael, M.D.

Defendant has designated Elizabeth H. Raphael, M.D. as an expert to testify based on her education, training and experience as a physician and biomechanical engineer to the following opinions as outlined in her expert report:

1. [Plaintiff] was not wearing a bicycle helmet at the time of the subject accident.

2. [Plaintiff] sustained her moderate (AIS 2) to critical (AIS 5) head and brain injuries as a direct consequence of her unhelmeted head hitting the ground during the crash sequence.

3. To a reasonable degree of medical and engineering certainty, had [Plaintiff] been correctly wearing a properly fitted bicycle helmet at the time of the subject crash, she would not have sustained a serious (AIS 3+) head injury.

Raphael Rep. at 11.

Plaintiff seeks to have these portions of Dr. Raphael's expert report excluded on grounds that these opinions are irrelevant and would not assist the trier of fact in analyzing any issue relevant to the parties' dispute because Plaintiff had no duty under Indiana law to wear a helmet at the time of the accident and jurors do not require expert testimony to understand that wearing a helmet while bicycling can prevent a serious head injury. Defendant rejoins that the challenged opinions are both relevant and helpful to the jury in analyzing its affirmative defense of misuse and in assessing comparative fault. We address these arguments in turn below.

### 1. Relevance

Under the Indiana Products Liability Act (IPLA), a seller cannot be held liable for any injury that occurred because of misuse of the product not reasonably expected by the seller at the time it was sold or conveyed. Ind. Code § 34-20-6-4. There is no dispute that Defendant has raised in this case the affirmative defense of misuse of the product based on Plaintiff's failure to wear a helmet. *See* Am. Ans. at 10–11.

Under Indiana law, the misuse defense is a "complete" defense that requires a seller to "show both that the misuse of the product is: 1) the cause of the harm; and 2) not reasonably expected by the seller." *Cambell Hausfeld/Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953, 959 (Ind. 2018). Dr. Raphael's opinions that Plaintiff's head injury was caused by her "unhelmeted head" hitting the ground, which injury Plaintiff would not have suffered had she been wearing a helmet are therefore relevant to the jury's consideration of the first element of Defendant's defense of misuse.

The fact that there is no duty under Indiana law to wear a bicycle helmet does not alter our analysis.  While Plaintiff may argue at trial that the lack of such a duty proves that her failure to wear a helmet should have been reasonably foreseeable to Defendant, thereby negating the second element of the defense, it is beyond our purview to make that determination in the context of deciding a pre-trial motion to exclude, particularly considering that "[m]isuse is typically a question of fact for a jury to decide."  *Id.* (citing *Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1149 (Ind. 2003); *see also Dailey v. Honda Motor Co.*, 882 F. Supp. 826, 827–28 (S.D. Ind. 1995) (recognizing that "foreseeability of the intervening misuse is a jury question").  At this stage of the proceedings we cannot say as a matter of law that Plaintiff's failure to wear a helmet should have been "reasonably expected" by Defendant such that Defendant should be precluded from asserting its misuse defense.  Likewise, we cannot rule at this stage on whether Dr. Raphael's challenged opinions are irrelevant and thus inadmissible.

Contrary to Plaintiff's arguments to the contrary, Dr. Raphael's opinions are also potentially relevant in the context of comparative fault.  Indiana law provides that "comparative fault principles apply in products liability cases."  *Campbell Hausfeld*, 109 N.E.3d at 956 (citing Ind. Code § 34-20-8-1).  Under the Comparative Fault Act, "the jury assesses percentage of fault by considering the fault of all persons who *caused or contributed to cause* the alleged injury."  *Webber v. Butner*, 923 F.3d 479, 483 (7th Cir. 2019) (citations and quotation marks omitted) (emphasis in original).  Thus, "to be considered in apportioning fault, the plaintiff's failure to use [a] safety device must have a

causal nexus to [her] injury." *Id.* at 484 (citing *Kocher v. Getz*, 824 N.E.2d 671, 675 (Ind. 2005)).

In *Webber*, the Seventh Circuit found the district court erred in admitting evidence that the plaintiff was not wearing a hardhat at the time a tree branch fell and hit him in the head and in submitting an instruction to the jury that allowed them to consider that fact in apportioning fault because, "[s]ince there was no causal relationship between [the plaintiff's] lack of a hardhat before the injury and the injury-causing event or the injuries themselves, Indiana law did not provide a basis for admitting this evidence." 923 F.3d at 484. Here, in contrast, Dr. Raphael has opined that Plaintiff's failure to wear a helmet *was* the cause of her head injury and that she would not have suffered a head injury if she had been wearing a helmet. Accordingly, unlike the situation in *Webber*, Defendant intends to introduce evidence that a causal relationship exists between Plaintiff's failure to use a safety device (a bicycle helmet) and both the injury-causing event (Plaintiff's unhelmeted head hitting the pavement) and her resulting injuries (head injury). Dr. Raphael's expert report is therefore potentially relevant to the issue of comparative fault. Plaintiff does not otherwise challenge Dr. Raphael's qualifications, or the reliability of the methods used to arrive at her opinions.[6]

---

[6] We emphasize that the correctness of Dr. Raphael's conclusions is not our concern in determining whether her opinions are admissible under *Daubert* and Rule 702. *See, e.g.*, *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 595) ("[T]he key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion …."); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce—that is, whether the conclusions are unimpeachable.").

For these reasons, we disagree with Plaintiff's contention that the challenged portions of Dr. Raphael's expert report are irrelevant and should be excluded on that basis. We note, however, that this ruling does not prevent Plaintiff from raising relevance objections to Dr. Raphael's testimony at trial as the evidence unfolds, if and as may be appropriate.

### 2. Helpful to Trier of Fact

Alternatively, Plaintiff argues that Dr. Raphael's challenged opinions should be excluded on grounds that they will not assist the trier of fact. Specifically, Plaintiff contends that "[i]t does not take an expert witness to opine that a bicycle helmet can prevent a serious head injury from occurring." Dkt. 101 at 6. Defendant responds that Plaintiff is greatly oversimplifying Dr. Raphael's expected testimony, which addresses the precise location, cause, and nature of the epidural hematoma injury that Plaintiff suffered and whether a helmet in this particular case would have protected Plaintiff from that injury. Defendant argues that Dr. Raphael relies on her extensive medical and engineering background as well as biomechanical testing to support her opinions, all of which are beyond the common knowledge of a layperson.

To be admissible, an expert opinion must be "something more than what is obvious to the layperson." *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (internal quotation omitted). However, while it is true that the average juror likely has a general, abstract understanding that wearing a helmet can prevent head and/or brain injuries, "a distinguishing feature of an expert is the ability to take the case's facts, synthesize them in light of the expert's specialized knowledge or expertise, and thereby

aid the jury to reach a conclusion otherwise unreachable through its own devices, even if some of the building blocks touch on areas within the jury's common knowledge." *SCCI Hosps. of Am., LLC v. Home-Owners Ins. Co.*, 571 F. Supp. 3d 942, 950 (N.D. Ind. 2021). Thus, an expert's "opinion may overlap with the jurors' own experiences or cover matters that are within the average juror's comprehension, so long as the expert uses some kind of specialized knowledge to place the litigated events into context." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 484 (7th Cir. 2020), *cert. denied*, 141 S.Ct. 2877 (June 28, 2021) (Mem. (internal quotation marks and citations omitted).

Here, Dr. Raphael relies on her specialized expertise in medicine and engineering as well as the results of biomechanical testing to opine that Plaintiff would not have sustained a permanent brain injury under the facts of this particular fall had she worn a helmet. While it may be common knowledge that helmets can prevent head injuries, Dr. Raphael's testimony goes beyond that general principle and will aid the jury by providing medical and engineering knowledge to assist it in determining whether Plaintiff's failure to wear a helmet was a proximate cause of Plaintiff's injuries. Accordingly, Plaintiff's argument that Dr. Raphael's opinions must be excluded because they will not assist the trier of fact is not well-taken.

### B. Stephen Werner

Defendant has designated Stephen Werner, Ph.D., P.E., as an expert witness to testify based on his experience in mechanical engineering and accident reconstruction as to the cause of the final fracture of the bicycle pedal adapter at issue in this litigation. Dr. Werner has a Bachelor of Science degree, as well as master's and doctorate degrees in

Mechanical Engineering, all from the University of California, Berkley. He is currently a

principal engineer at Exponent with specific expertise in accident reconstruction. Dr.

Werner has analyzed hundreds of bicycle crashes and has studied bicycle accident

dynamics for over thirty years. He has also spent years conducting bicycle dynamics and

rider kinematics research and has published peer-reviewed literature on these topics.

On November 8, 2021, Dr. Werner issued his expert report in this case. Plaintiff

seeks to have Dr. Werner precluded from offering the following opinions at trial:

1. The EMS report scenario attributed to [Plaintiff's boyfriend] for [Plaintiff's] crash is that she was attempting to enter the sidewalk from the street. Interaction with the curb caused her bicycle to turn away from the sidewalk and fall onto the sidewalk. This scenario is consistent with the dimensions of the sidewalk, the kinematics of a cyclist fall under these conditions, and the agreed-upon rest position of [Plaintiff] on the sidewalk. This is the most likely scenario for [Plaintiff's] crash.

2. [Plaintiff] was not riding on the sidewalk when the pedal broke.

3. The right pedal was either removed and then reinstalled at some point prior to the crash or loosened one thread due to contact of the pedal adapter system striking something.

4. The intended use of the Surely bicycle [Plaintiff] was riding at the time of her crash included wearing a helmet while riding to protect her head from injury.

5. [Plaintiff's] testimony that she only rode on the sidewalk during her rides is not supported by the video evidence from the morning of her crash wherein she is never observed riding on the sidewalk.

Dkt. 99 at 6–7.

Plaintiff argues that Dr. Werner's testimony should be excluded because his

opinions are unreliable, based entirely on inadmissible hearsay, conjecture, and

speculation not supported by the objective physical evidence, and do not assist the trier of fact. Defendant opposes Plaintiff's motion to exclude.

### 1.  Accident Causation and Riding Position Testimony

Plaintiff first contends that Dr. Werner's opinion that her bicycle accident was caused by her striking the raised curb at "too shallow an angle," causing her bicycle to turn away from the sidewalk and tip over, must be excluded because it is not the product of reliable methodology as Dr. Werner performed no testing or calculations to reach his opinion; rather, it is based solely on the hearsay description of the accident contained in the EMS report narrative which is contradicted by Plaintiff's boyfriend's deposition testimony. Alternatively, Plaintiff argues for the exclusion of this opinion on grounds that it will not assist the trier of fact because "the striking of a raised curb at an angle causing an individual to lose control of their bicycle is well within the knowledge of a lay juror." Dkt. 99 at 10. We address these arguments in turn below.

Following our careful review and consideration of Dr. Werner's report and deposition testimony, we find that his causation opinion is based on reliable principles and methods. In forming his opinions, Dr. Werner considered, *inter alia*, his personal inspection, observations, and measurements of the sidewalk and manhole cover location at the accident scene where Plaintiff was positioned after her crash; his laboratory inspection of the subject pedal adapter and measurements of the bicycle dimensions; Plaintiff's deposition testimony and her account of the accident, deposition testimony of Plaintiff's boyfriend and the responding EMT; the EMT's written report completed two hours after the accident containing the EMT's observations of Plaintiff's location

following the crash as well as statements provided by Plaintiff's boyfriend at the scene describing the accident; and GoPro video footage taken by Plaintiff and her boyfriend during portions of their ride shortly before the crash. Applying his expertise and training as an accident reconstructionist and drawing on past testing he has performed in the field of bicycle rider kinematics, Dr. Werner opined that the physical evidence he considered is more consistent with the description of the accident contained in the EMT's report and inconsistent with Plaintiff's account. This is the first of Dr. Werner's opinions that Plaintiff seeks to have excluded.

Plaintiff does not question Dr. Werner's qualifications to testify as to these matters; instead, he challenges only the reliability of his methods. Dr. Werner's opinions are based on his years of experience and training in the fields of mechanical engineering and accident reconstruction as well as his investigation into the facts underlying this case, and his past research and testing in bicycle and rider kinematics. As Defendant argues, expert opinions can be based, as Dr. Werner's opinions are here, on existing knowledge, experience, and training, including testing conducted prior to the case so long as the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). There is no indication that Dr. Werner's methods which he applied here fall outside those employed by other experts in the field of accident reconstruction. Plaintiff takes issue with Dr. Werner's failure to utilize calculations, models, or reconstructions particular to her actual kinematics and/or body movement, but has not cited, nor have we found, caselaw providing that such methods are required in the field of

accident reconstruction. *See Taylor v. Rice*, No. 2:17-cv-344, 2020 WL 859397, at * 2 (N.D. Ind. Feb. 21, 2020) (finding accident reconstruction expert who performed no mathematical calculations but "relied upon [the plaintiff's] version of events, as well as inspection of the accident site, including video recordings 'of the paths of travel' by the two vehicles in the accident" to have used sufficiently reliable methodology to be permitted to testify "as to how the accident occurred"). Thus, Dr. Werner's failure to apply such methodology, while potentially "fruitful grounds" for cross-examination as to the accuracy and credibility of his conclusions, is "not a basis to exclude him from testifying." *Id.* at *3.

Plaintiff also contends that Dr. Werner's causation testimony should be excluded as unreliable because he relied on inadmissible hearsay in forming his causation opinion, to wit, the EMS report. However, the admissibility of the EMS report is not now an issue before the Court, and it is therefore premature to decide whether Dr. Werner's testimony must be excluded on this basis. Moreover, even if the EMS report is ultimately deemed inadmissible, Dr. Werner's opinions which rely on that report need not necessarily be excluded under Rule 703, which provides, "[i]f experts in the particular field would reasonably rely on these kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. The EMS report, which was prepared and completed within two hours of the accident and memorializes the first responders' observations as well as the accounts of witnesses at the scene, told to them when they arrived on the scene, including the number of individuals involved in the accident, the nature of the accident, and how and when it occurred, is the

type of document on which an accident reconstructionist would likely rely to gather relevant background information.

The fact that Plaintiff's boyfriend's deposition testimony may contradict some of the information contained in the EMS report does not alter our analysis. "Experts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. Feb. 23, 2006) (collecting cases). This fact alone "does not mean that the expert has made impermissible credibility determinations that preclude him from testifying." *Id.*; *see also* Fed. R. Evid. 702, Advisory Comm. Notes 2000 ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."). Although the facts are in dispute here, this is not a case where there is no factual support in the evidentiary record for the expert's opinion. Accordingly, Dr. Werner's causation testimony will not be excluded at this time based on his reliance on the EMS report.

Finally, we conclude that Dr. Werner's causation testimony will likely be helpful to the fact finder. Plaintiff contends that Dr. Werner's causation testimony must be excluded because no specialized knowledge or expert testimony is needed to help a layperson understand that a bicyclist could lose control of their bike "if they encounter a raised surface at an angle." Dkt. 99 at 17. However, while a layperson may generally understand that hitting a curb at a shallow angle may cause a bicyclist to fall, an average

juror is not as likely to understand the kinematics of why that occurs and why that is more or less likely to have occurred in this case. *See Davis v. Duran*, 277 F.R.D. 362, 366–67 (N.D. Ill. 2011) ("To be helpful, the testimony must concern a matter beyond the understanding of the average person.") (citations omitted).  Accordingly, Dr. Werner's testimony, which speaks to these issues based on his specialized knowledge in the fields of mechanical engineering and accident reconstruction, will be helpful to the jury in considering the cause of Plaintiff's accident.  *See Viamedia, Inc.*, 951 F.3d at 484 (holding that an expert's "opinion may overlap with the jurors' own experiences or cover matters that are within the average juror's comprehension, so long as the expert uses some kind of specialized knowledge to place the litigated events into context") (internal quotation marks and citations omitted); *Sajda v. Brewton*, No. 2:08-CV-255 JVB, 2011 WL 501058, at *4 (N.D. Ind. Feb. 10, 2011) (finding the testimony of an expert in the field of accident reconstruction "will be helpful to the jury because he has more experience in the field of accident reconstruction than the average layperson").

### 2.  Testimony Regarding Plaintiff's Riding Location

Plaintiff also seeks to have excluded Dr. Werner's opinions that "[g]iven the dimensions of the sidewalk and the manhole, as well as the dimensions of the bicycle, it is not reasonable to conclude [Plaintiff] was riding on the sidewalk when her pedal broke," and "[t]he kinematics of a bicycle crash as described preclude a cyclist riding on the sidewalk and coming to rest where [Plaintiff] reportedly was."  Werner Rep. at 7. Plaintiff argues that these opinions are unreliable as they are based solely on Dr. Werner's assumptions and subjective beliefs and were not reached using reliable methodology.

For the same reasons discussed above with regard to Dr. Werner's causation testimony, we conclude that the methodology he applied, based on his years of experience and training in the fields of mechanical engineering and accident reconstruction and testing in bicycle and rider kinematics, as well as his investigation into this case, including measurements of the sidewalk and Plaintiff's reported position following the crash, is sufficiently reliable to be admissible.  Again, Plaintiff is free to fully cross-examine Dr. Werner regarding his methods to show the jury what she believes are the weaknesses in the foundations of his testimony. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 3. Pedal Loosening Testimony

It is undisputed that the right pedal adapter on Plaintiff's bicycle was screwed one thread loose at the time of her accident and had been loose for some unknown period of time leading up to the crash, but the parties dispute whether the pedal adapter loosened because of a design defect or for some other reason.  In her motion to exclude, Plaintiff states that, "[p]ursuant to Dr. Werner's report, he intends to testify at trial that the pedal adapter became one thread loose because it was 'either removed and then reinstalled at some point prior to the crash or loosened one thread due to contact of the pedal adapter system striking something.'"  Dkt. 99 at 19.  Plaintiff seeks to have this opinion excluded as unreliable because it is based solely on Dr. Werner's speculation and assumption and was not reach through any scientific testing or other reliable methodology.  Dkt. 99 at 19.

However, based on our review of Dr. Werner's expert report and deposition testimony, we do not understand that he intends to definitively opine as to the cause of the pedal adapter loosening.  Rather, the crux of his testimony is simply that the loosening could not have been caused by simple precession[7] forces alone, as Plaintiff's expert, Alan Cote, opines.  Dr. Werner bases this opinion on his personal inspection of the subject pedal and adapter indicating that the adapter was at one time properly and completely threaded, his knowledge regarding the nature of precession forces, the extent of the standard testing performed on bicycle components, and his field experience in the area of pedal design.  Plaintiff has not challenged the reliability of this portion of Dr. Werner's testimony and it is clear that Dr. Werner has a scientific basis for this conclusion.

Having used reliable methodology to rule out Mr. Cote's explanation for the loosening, Dr. Werner can opine that it is more likely that something else was the cause of the loosening and testify based on his experience, training, and knowledge in the field of mechanical engineering as to what other potential causes could be, *i.e.*, either the pedal adapter having been removed and re-installed one thread loose or the pedal adapter having loosened a thread due to contact of the pedal adapter system striking something, without definitively naming the cause.  *See Auto-Owners Ins. Co. v. Uniden Am. Corp.*, 503 F. Supp. 2d 1087, 1093 (E.D. Wis. 2007) (recognizing that the "process of

---

[7] Precession is a term used in physics to describe "the slow movement of the axis of a spinning body around another axis due to a torque acting to change the direction of the first axis."  Dkt. 108 at 7, n.3.

elimination is an acceptable methodology in the scientific and engineering communities").  Plaintiff will, of course, be free to cross-examine Dr. Werner regarding the fact that he performed no scientific testing in reaching his conclusions regarding potential alternative causes for the loosening of the pedal adapter, but this goes to the weight not admissibility of this portion of his testimony.

### 4.  Testimony Regarding Intended Use of Bicycle and Bicycle Helmet

Plaintiff next argues that Dr. Werner's testimony regarding the intended use of the bicycle, particularly Plaintiff's failure to wear a bicycle helmet, should be excluded because it is irrelevant.  For the same reasons discussed above with reference to Dr. Raphael's testimony, such evidence is potentially relevant to the defense of misuse of the product as well as comparative fault.  Accordingly, we will not exclude such testimony on relevance grounds at this juncture.

### 5.  Testimony Regarding Video Evidence

Finally, Plaintiff seeks to have Dr. Werner precluded from testifying at trial that Plaintiff's testimony that she rode her bicycle only on the sidewalk is unsupported by the video evidence.  Plaintiff argues that Dr. Werner's opinion regarding the truthfulness of her testimony is improper and would not assist the trier of fact because her credibility does not involve specialized knowledge requiring expert testimony.  Defendant rejoins that Dr. Werner's review of the video evidence of Plaintiff riding in the street and his opinion, based on that evidence, that it is more likely Plaintiff was riding on the street than the sidewalk at the time she fell is an important underlying fact that supports the

remainder of his opinions and therefore will help the jury understand his ultimate opinion in this case.

We agree with Plaintiff that her credibility is an issue for the jury alone to decide and is not an issue on which expert testimony is necessary or permitted. *See S.E.C. v. Lipson*, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998) ("[E]xpert testimony must not be allowed to cross over the line of helpfulness and to invade the quintessential jury function of determining the credibility of witnesses."). Dr. Werner therefore will not be permitted to testify that the video evidence conflicts with Plaintiff's testimony or otherwise testify as to Plaintiff's credibility as that is an issue the jurors can and must determine for themselves. Dr. Werner may, however, testify that he reviewed the video evidence and explain to the jury how the video supports his opinions regarding the manner in which the accident occurred without commenting on whether what is depicted in the video conflicts with testimony given by Plaintiff.

### C. Ronald Parrington

Defendant has designated Ronald Parrington, P.E., a materials and metallurgical engineer with over forty years of experience, as an expert witness, based on his knowledge and experience in areas related to failure analysis, wear, materials and laboratory testing, fatigue, and fractography, which is the method of studying the fracture surface of materials. Plaintiff seeks to have the following opinions offered by Mr. Parrington excluded under Rule 702 and *Daubert*:

1. An adequately pre-torqued pedal would not self-loosen, because the breakaway torque required to loosen the joint would be far greater than the weak precession forces acting to loosen the joint.

2. Impact loads, as indicated by the wear scars on the outboard end of the right pedal and the rubbed band(s) on the pedal adapter fracture surfaces, accelerated fatigue crack initiation and propagation.  Likewise, impact loads due to hitting an item or curb during bicycling would also contribute to the timing of the final fast fracture.

Dkt. 100 at 2.

Plaintiff seeks to have these opinions excluded on grounds that they are unreliable and do not assist the trier of fact in analyzing any issue relevant to the parties' dispute. Plaintiff seeks also to have Mr. Parrington excluded from offering any opinion as to the ultimate cause of the final fracture of the pedal adapter because he deferred to Dr. Werner on that issue.  We address these arguments in turn below.

## 1.  Loosening of Adequately Torqued Pedal Testimony

As discussed above, there is a dispute between the parties regarding whether a product defect caused the right pedal adapter on Plaintiff's bicycle to loosen by one thread, leading to a fatigue fracture in the bicycle pedal.  Plaintiff's design defect theory is that the subject pedal was designed with a pedal adapter that created a self-loosening threaded joint between the adapter and the pedal axel, such that precession forces caused the joint to loosen itself under routine pedaling, resulting in the fatigue failure.  Plaintiff seeks to exclude Mr. Parrington's testimony critiquing this theory.  Specifically, Mr.

Parrington opines that "[a]n adequately pre-torqued pedal would not self-loosen because the breakaway torque required to loosen the joint would be far greater than the weak precession forces." Parrington Rep. at 20. Plaintiff argues this opinion must be excluded because Mr. Parrington offered no methodology to support his opinion and failed to quantify either the breakaway torque or precession forces at issue or perform any other testing or analysis to prove his hypothesis.

Plaintiff has not challenged Mr. Parrington's qualifications to opine on these matters, only the reliability of his methodology. Mr. Parrington's curriculum vitae shows that he has significant experience with threaded joints and related issues like breakaway torque and precession forces, including conducting numerous studies on issues related to pre-torque. We understand Mr. Parrington to have applied general engineering and scientific principles, based on his education and experience, in reaching his conclusion that precession forces are not sufficiently strong to loosen an adequately pre-torqued pedal. Given Mr. Parrington's extensive practical experience in these areas, such methods are sufficiently reliable under *Daubert* and Rule 702. *See Kumho*, 526 U.S. at 150 (stating that in some cases "the relevant reliability concerns may focus on personal knowledge or experience"); *Dartey v. Ford Motor Co.*, 104 F. Supp. 2d 1017, 1024 (N.D. Ind. 2000) (expert who applied "obvious" and "well-established scientific principles, based upon his education and experience, in reaching his conclusions" held to have used reliable methods). Mr. Parrington's failure to specifically quantify the breakaway or pre-torque forces in comparison with precession forces does not render his methodology

unreliable, but is a subject that Plaintiff is obviously free to explore on cross-examination to aid the jury in determining what weight to give his testimony.[8]

### 2. "Wear Scar" Testimony

Plaintiff next seeks to have excluded Mr. Parrington's opinion that "wear scars" he observed on the subject pedal indicate "impact loads" to the pedal which "accelerated the fatigue crack and propagation." Dkt. 100 at 7. Specifically, Mr. Parrington opined:

> In addition to the cyclic loads due to pedaling, other sources of loading could contribute to the fatigue crack initiation and final fast fracture. Impact loads, as indicated by the wear scars on the outboard end of the right pedal and the rubbed band(s) on the pedal adapter fracture surfaces, accelerated fatigue crack initiation and propagation. Likewise, impact loads due to hitting an item or a curb during bicycling would also contribute to the timing of the final fast fracture.

Parrington Rep. at 21. Plaintiff seeks to have this opinion excluded as irrelevant because "it is clear from [Mr.] Parrington's opinions and testimony that the 'wear scars' and alleged 'impact loads' which he claims to have identified on the pedal body and the surface of the adapter did not cause either the initial fatigue fracture to propagate or the final fatigue fracture to occur …." Dkt. 100 at 7 (emphasis removed).

Plaintiff does not challenge Mr. Parrington's qualifications to render this opinion nor the reliability of his methodology; rather, she seeks exclusion solely on the basis of

---

[8] We pause to note that we do not view our conclusion here to be inconsistent with our determination that Mr. Cote's testimony on this same issue is excludable as unreliable based in part on his failure to rely on any objective data. A lack of objective testing results was only one of several deficiencies in Mr. Cote's testimony. Mr. Parrington's opinion was more closely tied to sufficiently well-established scientific principles than Mr. Cote's conclusions such that detailed testing is not essential to establish the reliability of Mr. Parrington's testimony. In any event, Mr. Parrington's testimony on this issue may no longer be relevant since it was proffered to rebut Mr. Cote's now-excluded "precession theory" testimony.

relevance.  Testimony is relevant under the Federal Rules of Evidence "as long as it 'has any tendency to make a fact more or less probable' than it would otherwise be." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013).  Under the relevance prong, a court must ensure that the proposed expert testimony "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharma. Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995).

We cannot at this time say that Mr. Parrington's opinion that "impact loads"[9]—as opposed to a defect in the pedal as Plaintiff claims—contributed to the initiation and propagation of the fatigue fracture and timing of the final fracture is irrelevant testimony as such opinion "logically advances a material aspect" of Defendant's case, to wit, that an impact and/or wear and stress on the bicycle, not a defect in the pedal could have caused Plaintiff's injuries.  Accordingly, we find no legal grounds to exclude Mr. Parrington's testimony on relevance grounds prior to trial.

### 3.  Testimony Regarding Cause of Final Fracture

Finally, Plaintiff seeks to have Mr. Parrington precluded from offering any opinion at trial regarding the cause of the final fracture of the pedal adapter because he failed to offer any such opinion in his written report and deferred in his deposition testimony to another of Defendant's expert, Dr. Werner, on that issue.  However, Mr. Parrington's testimony is more nuanced than Plaintiff has characterized, and the nature of

---

[9] Mr. Parrington testified that an impact load "would be two objects coming together under some type of relative motion.  Not sliding against each other.  More of a hitting each other, striking each other."  Parrington Dep. at 84.

his opinions preclude a broad, pre-trial ruling as requested by Plaintiff. It is well recognized that one party cannot ambush the other at trial with expert opinions which were not properly disclosed in an expert report. If Plaintiff believes at trial that Defendant is attempting to introduce opinions from Mr. Parrington that were not disclosed previously, she may object to them at that time.

## Conclusion

For the foregoing reasons:

- Defendant's Motion to Exclude or Limit the Opinion Testimony of Polly Westcott, Psy.D., HSPP [Dkt. 97] is <u>DENIED</u>;

- Defendant's Motion to Exclude or Limit the Opinion Testimony of Thomas Eagar, SC.D., P.E. and Alan Cote [Dkt. 107] is <u>GRANTED</u> as to Mr. Cote's "precession theory" opinions and as to Dr. Eagar's failure to warn, manufacturing defect, and belatedly disclosed design defect opinions and is otherwise <u>DENIED</u>;

- Plaintiff's Motion to Exclude Expert Witness Stephen Werner, PhD., P.E. [Dkt. 104] is <u>GRANTED</u> as to any testimony regarding Plaintiff's credibility and is otherwise <u>DENIED</u>;

- Plaintiff's Motion to Exclude Expert Witness Elizabeth H. Raphael, M.D. [Dkt. 105] is <u>DENIED</u>; and

- Plaintiff's Motion to Exclude Expert Witness Ronald Parrington [Dkt. 106] is <u>DENIED</u>.

Additionally, Plaintiff is <u>ORDERED</u> to disclose to defense counsel the underlying raw data and test scores relied upon by Dr. Westcott in reaching her opinions in this

matter, pursuant to a stipulated protective order submitted to the Court within thirty (30) days of the date of this Order.

 IT IS SO ORDERED.

Date: _____9/30/2022_____

            _____
            SARAH EVANS BARKER, JUDGE
            United States District Court
            Southern District of Indiana

Distribution:

Joseph Gregory Eaton
BARNES & THORNBURG, LLP (Indianapolis)
joe.eaton@btlaw.com

Brady J. Rife
STEPHENSON RIFE LLP (Shelbyville)
bradyrife@srtrial.com

Robert Roth
REED SMITH LLP
rroth@reedsmith.com

Sean Robert Roth
STEPHENSON RIFE LLP
seanroth@srtrial.com

Lauren Nottoli Schwabe
BARNES & THORNBURG, LLP (Indianapolis)
lauren.schwabe@btlaw.com

M. Michael Stephenson
STEPHENSON RIFE LLP (Shelbyville)
mikestephenson@srtrial.com